**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger**

Civil Action No. 14-cv-00370-MSK-MJW

**COLORADO PRESS ASSOCIATION, INC., and
WE ARE PUEBLO, LLC d/b/a Pulp,**

     **Plaintiffs,**

v.

**BARBARA J. BROHL, in her official capacity as the Executive Director of the Colorado
Department of Revenue,**

     **Defendant.**

---

**OPINION AND ORDER GRANTING MOTION TO DISMISS**

---

     **THIS MATTER** comes before the Court pursuant to the Defendant's ("the State")

Motion to Dismiss **(# 90)** the Fifth Amended Complaint, the Plaintiffs' response **(# 99)**, and the

State's reply **(# 101)**. Also pending is the Plaintiffs' Motion for Preliminary Injunction **(# 40)**.

**BACKGROUND**

     The current operative pleading in this case is the Fifth Amended Complaint **(# 89)**. The

Plaintiffs, a publication (Plaintiff We Are Pueblo, self-designated as "Pulp") and an association

of small publishers (Plaintiff Colorado Press Association, hereafter "CPA"), challenge the

regulations promulgated by the State's Marijuana Enforcement Division that place certain

restrictions on the advertising of marijuana-related products and services.

     The regulations at issue are found at 1 C.C.R. 212-2, R 1104 *et seq.* Although various

subparts of the regulations address different advertising media, the Court focuses on the

1

regulations that govern print and internet businesses.  This is because the Fifth Amended

Complaint indicates that Pulp and CPA work only in those media.

The regulation governing print media states, in pertinent part, "A Retail Marijuana

Establishment shall not engage in Advertising in a print publication unless the Retail Marijuana

Establishment has reliable evidence that no more than 30 percent of the publication's readership

is reasonably expected to be under the age of 21."  1 C.C.R. 212-2, R 1106.  The provision

governing internet advertising is substantively identical.  1 C.C.R. § 212-2, R 1107.  Arguably,

the Plaintiffs also challenge the provision of 1 C.C.R. § 212-2, R 1109, which provides that "A

Retail Marijuana Establishment shall not engage in Advertising that specifically targets Persons

located outside the state of Colorado."

In the Fifth Amended Complaint, the Plaintiffs identify themselves as "publications or

[entities that] represent the interests of publications which engage in advertising marijuana-

related products or services."

Pulp identifies itself as an organization "which produces a monthly print news magazine

and regularly posts stories on its website."  It states that it "reaches an audience of 24,000+

people per month, and its content focuses on issues of particular interest to the southern rockies

and western plain regions."  Pulp further states that it "generates much of its revenue by selling

print advertisements, with companion web advertisements if the client so chooses." It also states

that in February 2014, a retail marijuana dispensary "expressed strong interest to Pulp's

publisher in purchasing a full-age ad," but that "after further evaluating Colorado law regulating

advertisements concerning marijuana-related products, the dispensary elected not to purchase

*any* ad from Pulp."  It  "estimates that it has and will continue to lose thousands of additional

dollars per month in advertising revenue from other Retail Marijuana Establishments that would

be Pulp customers, but have chosen not to advertise with Pulp because of the regulations challenged herein."  The Fifth Amended Complaint contains no allegations about the demographics of Pulp's readership, either in print or online.

CPA identifies itself as an association "comprised of more than 150 daily and weekly newspapers, reaching a combined readership of more than 2.5 million throughout Colorado."  Its member newspapers also maintain websites.  Some of CPA's members "currently publish advertisements for medical marijuana dispensaries," and are "interested in also publishing advertisements for the now lawful (in Colorado) product, retail marijuana."  It states that "very few of the CPA's member newspapers have access to reliable information about the age or other demographics of their readers."

The Plaintiffs assert two claims, both under 42 U.S.C. § 1983: (i) that the regulations constitute an impermissible restraint on their First Amendment rights to engage in commercial speech; and (ii) that the regulations "unconstitutionally amend the Colorado Constitution" – specifically, Art. XVIII, § 16 of the Constitution that provides "that marijuana should be regulated in a manner similar to alcohol" and Art. II, § 10, which prohibits any law "impairing the freedom of speech" – thus depriving the Plaintiffs of Due Process protected by the Fourteenth Amendment to the United States Constitution.  They seek declaratory and injunctive relief preventing the enforcement of the advertising regulations.

In conjunction with an earlier version of the Complaint, the then-plaintiffs (which at the time included Pulp and CPA, in addition to others) moved **(# 40)** for a preliminary injunction against the enforcement of the regulations. The Complaint was then amended, and  the State moved to dismiss **(# 90)** the claims in the Fifth Amended Complaint, arguing that: (i) the Plaintiffs lack standing to bring the claims herein; (ii) the First Amendment claim fails to state a

claim because the commercial speech at issue involves a product that is illegal under federal law; and (iii) the Eleventh Amendment to the U.S. Constitution deprives the Court of jurisdiction over claims alleging violations of Colorado's Constitution, or, in the alternative, the Court should engage in *Pullman* abstention to avoid hearing that claim.

## ANALYSIS

### A.  Standard of review

The Plaintiffs bear the burden of establishing sufficient standing to assert the claims herein.  *Kerr v. Hickenlooper*, 744 F.3d 156, 1163 (10th Cir. 2014).  In evaluating a motion to dismiss challenging the plaintiffs' standing, the Court treats  the allegations in the Complaint as true and construes them in the light most favorable to the plaintiffs.  *Id.*  The Court may permit parties to supplement the allegations in the Complaint with affidavits or other evidentiary material that elaborate upon the plaintiffs' standing, and, if it does so, the Court construes the statements in the affidavits in the light most favorable to the plaintiffs as well.  *Southern Utah Wilderness Alliance v. Palma*, 707 F.3d 1143, 1152 & n. 8 (10th Cir. 2013)

### B.  Standing

The presence or absence of a plaintiffs' standing to sue is an essential component of the Court's subject-matter jurisdiction; the absence of sufficient standing deprives the Court of such jurisdiction, requiring dismissal.  *Palma*, 707 F.3d at 1153.  The question of standing involves "both constitutional limitations on federal court jurisdiction and prudential limitations on its exercise."  *Kowalski v. Tesmer*, 543 U.S. 125, 128-29 (2004).

Constitutionally, the obligation of a party to demonstrate its standing flows from Article III's "case or controversy" requirement.  *Id.*  To establish standing to sue, a plaintiff must demonstrate: (i) that it has suffered a concrete and particular injury in fact that is either actual or

imminent; (ii) that the injury is fairly traceable to the alleged actions of the defendant; and (iii) that the injury will likely be redressed by a favorable decision. *Kerr*, 744 F.3d at 1163; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

Even where a plaintiff can arguably demonstrate constitutional standing, courts sometimes indulge "prudential limitations" to avoid hearing the matter. These limitations are "judicially self-imposed limits on the exercise of federal jurisdiction." *U.S. v. Windsor*, 144 S.Ct. 2675, 2685 (2014). As relevant here, one commonly-applied prudential limitation on standing provides that "even when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, . . . the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975).

This case presents several unusual impediments to the ability of the Plaintiffs to establish standing to sue, each of which warrants some discussion.

### 1. CPA's Standing

First, the Court notes that CPA does not claim to publish advertisements in any media. Rather, it appears to be an association of such publishers (although the Fifth Amended Complaint never squarely states precisely what CPA actually is or what purpose it was created to serve). Thus, CPA's standing, if any, must arise via the "associational standing" doctrine. That doctrine grants CPA the ability to invoke the standing that one or more of its individual members would have if it shows: (i) that one or more of its members would have standing to bring the claims at issue in their own right; (ii) the members' interests that the CPA seeks to protect are germane to the CPA's purpose; and (iii) that neither the claim asserted nor the relief requested requires the participation of the individual members in the lawsuit. *Colorado Outfitters Assn. v.*

*Hickenlooper*, 24 F.Supp.3d 1050, 1059 (D.Colo. 2014).  On the record here, CPA fails on all three elements.

First, as discussed in more detail below, it is not at all clear that any of CPA's members – who are identified only in general and conclusory terms in the Fifth Amended Complaint and the affidavit of Jerry Raehal tendered in support of CPA's response to the motion – would have standing in their own right to challenge the regulations.[1]  But assuming they do, the record does not contain any facts describing CPA's purpose or that challenging the State's advertising regulations fits within that purpose.  At best, the Fifth Amended Complaint states only that CPA "represents the interests" of publishers without specifying what those "interests" might be.  It may be that CPA exists to provide its members with printing or distribution services, or exists to facilitate the sharing of content, or to provide lobbying services, none of which would necessarily contemplate the CPA litigating regulatory challenges on its members' behalf.  Third, because the regulations at issue only prohibit advertisements in publications that meet certain characteristics – *e.g.* those whose readership is substantially underage – the participation of the individual member of the CPA in this lawsuit is essential.  As discussed in some detail below,

---

[1] Unlike Pulp, the CPA has not made any non-conclusory assertions, in either the Fifth Amended Complaint or in Mr. Raehal's affidavit, that any particular retail marijuana operations have expressed a willingness to advertise in CPA-member publications, such that the regulation could be said to have had a "chilling effect" on such operations.  Mr. Raehal merely offers the speculative and utterly conclusory assertion that "It is my observation that a significant number of retail marijuana establishments in Colorado would have advertised in CP's member newspapers . . . but have chosen not to because of" the regulations.

In its reply brief, the State submitted a portion of deposition testimony from Mr. Raehal, in which he described a single incident involving a single CPA member, the Telluride Daily Planet.  Mr. Raehal explains that that newspaper was carrying advertising from a retail marijuana establishment, and the Town of Telluride instructed the advertiser to cease such advertising.  The newspaper then contacted the State's Marijuana Enforcement Division about the situation, and that agency contacted the Town "stating it was okay; that based on the information that they received, [the advertising] would comply with the law."  Thus, there is no evidence in the record to suggest that a CPA member has suffered any injury as a result of the State's implementation of the regulation.

whether or not an individual publisher is affected by regulations is a fact-intensive inquiry that CPA cannot address categorically on behalf of all of its members.  Thus, the Court finds that CPA has failed to establish its own associational standing in this case, requiring all of its claims to be dismissed.

### 2.  Pulp's Standing

The Court then turns to Pulp's standing.  Arguably, Pulp proceeds on two alternative theories of standing: that it has its own standing to sue, or that it is vicariously asserting the rights of third-parties.

It is notable that the regulations in question restrain retail marijuana establishments, but not publishers such as Pulp.   The prohibition in question is that "a Retail Marijuana Establishment shall not engage in Advertising . . ." and 1 C.C.R. § 212-2, R 1301 *et seq.* makes clear that enforcement of the regulations is had against the offending licensee; nothing in the regulation purports to authorize a punishment that can be imposed against a publisher or broadcaster who engages in prohibited advertising on behalf of a retail marijuana establishment. This raises the question of whether Pulp can show that it has or will suffer any actual injury which is necessary for standing.  Reserving that issue for a moment, the Court explores a second possibility for Pulp's standing – third-party standing.

As noted above, prudential limitations generally prevent a plaintiff from asserting claims premised on the alleged deprivation of rights suffered by a third party. However, some courts have recognized that, when First Amendment rights are implicated, a more "relaxed" standing inquiry is appropriate.  In *Secretary of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947 (1984), the Court considered a state law that prohibited a charitable organization from agreeing to pay a fundraiser more than 25% of the amounts raised by the fundraiser.  A fundraiser

challenged the law on First Amendment grounds, and the state argued that the fundraiser lacked standing because the law was directed at the charitable organizations, not the fundraisers.[2]  The Court rejected that argument in two steps.  First, it found that the fundraiser itself had suffered an injury of its own, in part because the parties stipulated that a particular charitable organization "was reluctant to enter into a contract with [the fundraiser] because of the limitation imposed by [the statute]."  *Id.* at 954.  This, the Court found, was "actual injury as a result of the statute."  *Id.* at 954-55.

Second, the Court turned to "prudential considerations that limit the challenges courts are willing to hear," such as the proposition that a plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."  *Id.* at 955.  However, the Court noted that "there are situations where competing considerations outweigh any prudential rationale against third-party standing."  *Id.*  It noted that "where practical obstacles prevent a party from asserting rights on behalf of itself . . ., the Court considers whether [a] third-party has sufficient injury-in-fact to satisfy the Art. III case-or-controversy requirement and whether, as a prudential matter, the third party can reasonably be expected properly to frame the issues and present them with the necessary adversarial zeal."  *Id.*  It noted that First Amendment cases sometimes presented such a situation:

> Even where a First Amendment challenge could be brought by one actually engaged in protected activity, there is a possibility that, rather than risk punishment for his conduct in challenging the statute, he will refrain from engaging further in the protected activity.  Society as a whole then would be the loser.  Thus, when there is a danger of chilling free speech, . . . [l]itigants [ ] are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or

---

[2]      The Supreme Court found that, as a factual matter, the fundraiser had been threatened with criminal prosecution under the statute.  *Id.* at 954.  The Court did not attempt to reconcile that fact with the state's argument that the statute restrained only the charitable organizations.

> assumption that the statute's very existence may cause others not
> before the court to refrain from constitutionally protected speech or
> expression.

*Id.* at 956-57.

The "third-party standing" doctrine announced in *Munson* gives Pulp a colorable basis to argue generally that it has standing to assert claims that the regulations intrude on the First Amendment rights of its putative advertisers. But that argument runs aground on a more focused point. In *The Pitt News v. Fisher*, 215 F.3d 354 (3d Cir. 2000), the court considered a state law that "provides criminal sanctions against businesses that advertise alcoholic beverages in newspapers and other materials published by, for or in behalf of any educational institution." *Id.* at 357. The plaintiff, a student newspaper, challenged the statute on First Amendment grounds, arguing that it had both its own standing to sue (because state action against a advertiser in the paper caused that advertiser to withdraw future advertisements from the newspaper) and could avail itself of the third-party standing doctrine to assert the rights of its putative advertisers. The Court of Appeals found that the newspaper could sufficiently demonstrate its own direct injury and standing (resulting from the actual loss of advertising revenue) but could not rely upon third-party standing. As to that latter point, the court explained that third-party standing is cognizable where three criteria are satisfied: (i) the plaintiff must have suffered an actual injury, although not necessarily one to its own legally-protected interests; (ii) the plaintiff must have a close enough relationship to the party whose rights are being asserted to ensure effective advocacy; and (iii) there must exist some hindrance to the third party's ability to protect its own interests. *Id.* at 362. The court found that the newspaper met the first two criteria, but failed on the third.

After carefully exploring *Munson*, the court in *Pitt News* distinguished the cases. It found that *Munson* (and others) "involved substantial threats to free speech, such that third parties were

forced to forego their rights entirely, or else face criminal prosecution to vindicate them," leading to an "inhibitory effect on freedom of speech." *Id.* at 364. The *Pitt News* court viewed the situation presented to it differently, finding that the newspaper had not shown "that its former advertisers are likely to have their speech chilled by the enactment . . . or that there is a risk they will forego their constitutionally protected rights." *Id.* Indeed, the newspaper had admitted that "its former advertisers have had an easy time delivering their messages to students and staff of all ages" via "other newspapers displayed on campus news racks immediately adjacent" and via magazines, radio and television ads, and billboards. *Id.* Thus, the court concluded that putative advertisers "have . . . not suffered substantial abridgment of their free speech rights," but merely "that such speech has been channeled to widely available non-student publications" available in the same locations. Because "the effect on third parties . . . is minimal in this case," the court concluded that the newspaper could not avail itself of the exception to the prudential standing rules requiring third parties to assert their own claims. *Id.* at 365.

This case is similar to *Pitt News* -  the regulation at issue in both cases targets advertisers, not publishers. In both cases, the terms of the regulation operate to preclude advertising in only a narrow subset of publications -- there, newspapers published by educational institutions; here, publications with a substantial underage readership – leaving advertisers the ability to speak in a wide variety of alternative publications and media. The plaintiff in both cases seeks to invoke third-party standing, asserting that the regulation places a "chilling effect" on a putative advertiser's willingness to advertise. As in *Pitt News*, the retail marijuana establishments affected by these regulations are not completely, or even substantially, precluded from speaking, nor are they materially constrained in their choice of advertising media. The only restraint placed on them is that they may not advertise in a media unless they have "reliable evidence"

that the publication does not have a specified percentage of underage consumers.  (In this regard, the regulation poses an even milder restraint than the statute in *Pitt News* that prohibited alcohol advertising in <u>any</u> educational institution's publication, apparently regardless of its demographic readership.)  For the same reasons as *Pitt News*, this Court finds that the actual burdens of the regulations on retail marijuana establishments' speech is so minimal that there is no meaningful impediment to such an establishment bringing suit it its own name, either anticipatorily or defensively.  Thus, as in *Pitt News*, prudential concerns warrant the Court declining to recognize Pulp's attempt to invoke the third-party standing of its potential advertisers.

### 3. Pulp's own standing

That leaves Pulp having to demonstrate that its own injuries grant it sufficient standing to challenge the regulations on its own accord.  The Fifth Amended Complaint alleges that, in February 2014, a retail marijuana establishment "expressed strong interest to Pulp's publisher in purchasing a full-age ad in Pulp at a price of $1000 per month for one to three months. However, after further evaluating Colorado law . . . the dispensary elected not to purchase any ad from Pulp."  Pulp goes on to state that it "estimates that it has and will continue to lose thousands of additional dollars per month in advertising revenue from other retail marijuana establishments that would be Pulp customers, but have chosen not to advertise with Pulp because of the regulations challenged herein."  Pulp submitted an affidavit from John Rodriguez, Pulp's publisher, but it does not elaborate with greater specifics.  It offers only the conclusory assertion that "there are a significant number of retail marijuana establishments in Colorado that would have advertised in Pulp . . . but have chosen not to do so because of" the regulations.

As noted above, the essential components of constitutional standing are actual injury, traceability of that injury to the challenged restriction, and redressability.  It is not at all apparent

from the Fifth Amended Complaint or Mr. Rodriguez's affidavit that Pulp has suffered an actual,

concrete injury as a result of the regulations.  Pulp alleges that the unnamed dispensary was

"strongly interested" in advertising with Pulp.  Under the regulation, the dispensary was free to

advertise with Pulp if the dispensary could obtain "reliable evidence" that no more than 30% of

Pulp's readership was under age 21.  Pulp does not address the demographics of its readership in

the Fifth Amended Complaint and Mr. Rodriguez's affidavit explains that "Pulp cannot afford to

even attempt to produce reliable evidence that no more than 30% of its online or print audience

is under 21 years of age."  According to the partial transcript of  Mr. Rodriguez' deposition

testimony: (i) Pulp's "target readership" is between the ages of 25 and 49; (ii) that Pulp "cover[s]

maybe the same type of issues that would be covered in a daily [newspaper], but [ ] in a way that

is palatable to a 25 to 49 year old"; (ii) that "an 18-year old would be less likely to read [Pulp]

than a 30-year old"; (iv) that Pulp "make[s] it very clear" to prospective advertisers (including in

written rate cards and media kits) that "our target demographic [is] 25 to 49"; (v) that Pulp is

presently carrying advertising for retail marijuana operations; and (vi) that he estimates that

Pulp's readership under age 21 is probably 5 to 10 percent.  The State has also submitted the

deposition testimony of Michael Johnson, another representative of Pulp.  Ms. Johnson

confirmed that Pulp's target demographic is the group of adults between the ages of 25-45,

"based on the content and the age and the feedback of who our readers are and why they like it

and so on.  Plus, John [Rodriguez] designed it for those readers."  Ms. Johnson stated that he

believed "the vast majority" of Pulp's readers fit within that age range, and she concurred with

Mr. Rodriguez's estimate that no more than 5% of Pulp's readership would be under age 21.

When told the terms of R 1106 and asked whether there was "reason to think that regulation

would affect Pulp," Ms. Johnson replied "No, because our demographic is older."

Based on these facts, there can be no reasonable argument that Pulp has sustained any injury as a result of the regulations.[3]  Indeed, both representatives of Pulp testified that Pulp is currently carrying advertisements from retail marijuana establishments in accordance with the regulations.  At best, Pulp offers only a hyperbolic argument that, because the regulation's "reliable evidence" standard is "vague and unworkable," Pulp is unable "to ascertain the precise composition of its audience because it is unclear from the regulations who exactly would constitute Pulp's 'audience'."  Such an argument flies in the face of Mr. Rodriguez and Mr. Johnson's testimony that Pulp purposefully and directly targets a demographic far older than age 21.  Thus, because there is no evidence in the record that Pulp has suffered or will suffer any injury from the operation of the regulations, Pulp lacks standing in its own right to pursue the claims here.

Because neither Plaintiff has demonstrated standing to pursue the claims asserted in the Fifth Amended Complaint, the Court grants the State's Motion to Dismiss and dismisses this action for lack of subject-matter jurisdiction.  Accordingly, the Court need not consider the Plaintiffs' Motion for Preliminary Injunction.

---

[3]  Pulp seems to rely on the single instance alluded to in the Fifth Amended Complaint in which an advertiser expressed interest in advertising, then subsequently withdrew.  Mr. Rodriguez addresses this situation to some extent in his deposition testimony.  He initially stated that the advertiser had "concerns about the . . . legal or regulations there," but also noted that "they were also concerned with the logo."  He later explained that, regarding the logo, "they were calling themselves Nature's Remedy . . so they were concerned with what would go into an ad that would make it, like I said, troublesome under the regulations."  That advertiser subsequently contacted an ad agency, and, through that ad agency, agreed to advertise in Pulp.

Thus, by all appearances, the advertiser initially withdrew from advertising in Pulp based on the advertisers concerns over the content of their own advertisement, not based on concerns that Pulp's readership demographics ran afoul of the regulations.

## CONCLUSION

For the foregoing reasons, the State's Motion to Dismiss (**# 90**) is **GRANTED**, and the claims herein are **DISMISSED** without prejudice for lack of federal subject-matter jurisdiction. The Plaintiffs' Motion for Preliminary Injunction (**# 40**) is **DENIED AS MOOT** in light of that dismissal.  The Clerk of the Court shall close this case.

Dated this 12th day of March, 2015.

**BY THE COURT:**

_____

Marcia S. Krieger
Chief United States District Judge